Elizabeth N. Pendleton, (LR IA 10-3, IL ARDC No. 6282050)
U.S. Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
Phone: (312) 596-0629
Facsimile: (312) 596-0714
Email: *ependleton@cftc.gov*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| **U. S. COMMODITY FUTURES TRADING COMMISSION,** | |
| **Plaintiff,** | **Case No:** |
| **v.** | |
| **LIONS WEALTH HOLDINGS, INC., LIONS WEALTH SERVICES, INC., 20/20 PRECIOUS METALS, INC. and BHARAT ADATIA,** | |
| **Defendants.** | |

### COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND PENALTIES UNDER THE COMMODITY EXCHANGE ACT

The United States Commodity Futures Trading Commission (the "Commission" or the "CFTC"), by and through its attorneys, alleges as follows:

### I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1 *et seq*. (2012).  The Commission has jurisdiction over the conduct and transactions at issue in this case pursuant to Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D) (2012).  This Court also has jurisdiction over the subject matter of this action and the defendants pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), which authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such

person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

2.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), in that defendants are found in, inhabit and/or transact or have transacted business in this District, and defendants' acts and practices in violation of this Act have occurred, are occurring, and/or are about to occur within this District, among other places.

## II.      INTRODUCTION

3.      Effective July 16, 2011, Section 742 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Public Law 111-203, 124 Stat. 1376 (2010), broadened the scope of the CFTC's jurisdiction to include financed commodity transactions with retail customers, including those at issue in this matter by amending Section 2(c)(2) of the Act to create a new subparagraph, Section 2(c)(2)(D), entitled "Retail Commodity Transactions".   Specifically, this broadened jurisdiction requires that financed commodity transactions with retail customers be executed on an exchange and, among other things, subjects these transactions to Section 4(a) of the Act, 7 U.S.C. § 6(a), and the anti-fraud provisions of Section 4b of the Act, 7 U.S.C. § 6b.   In addition, effective August 15, 2011, Section 753 of the Dodd-Frank Act amended Section 6(c) of the Act, 7 U.S.C. § 9 (2012), broadening the CFTC's anti-fraud jurisdiction.   The Commission subsequently issued a related regulation, specifically Regulation 180.1, 17 C.F.R. § 180.1 (2013).

4.      Beginning on or shortly after July 16, 2011, the date Section 2(c)(2)(D) of the Act became effective, and continuing through at least February 22, 2013 (the "relevant time"), defendants Lions Wealth Holdings, Inc. ("LWH") and Lions Wealth Services, Inc. ("LWS"), both doing business as "Lions Wealth Capital" (collectively "Lions Wealth"), through their officers, agents and other persons acting on their behalf, including defendant Bharat Adatia

("Adatia"), and defendant 20/20 Precious Metals, Inc. ("20/20 Metals"), through its officers, agents and other persons acting on its behalf, including Adatia, (collectively "Defendants") offered to enter into, entered into, confirmed the execution of, and conducted an office and business in the United States for the purpose of soliciting, accepting orders for, and otherwise dealing in illegal, off-exchange, financed commodity transactions with retail customers.

5.      Defendants falsely claimed to sell physical commodities, including gold, silver, platinum, and palladium, in off-exchange transactions to retail customers throughout the United States.  Most notably, Defendants falsely claimed to: (a) sell actual physical metals to customers; (b) make loans to customers to purchase the physical metals; (c) transfer title of physical metals to customers; and (d) arrange for the transfer and storage of customers' physical metals in independent depositories where such metal was purportedly held on the customers' behalf.

6.      In fact, Defendants did not purchase, sell, transfer ownership of, or arrange for storage of any physical metals in connection with the financed commodity transactions, and Defendants never had possession of, or title to, the physical metals they purported to purchase, sell, finance and/or transfer on behalf of retail customers.  Defendants also did not lend funds to customers to purchase physical metals or advance or loan physical metals to customers.  Rather, during the relevant time, Defendants introduced their retail customer accounts to Hunter Wise Commodities, LLC and its various subsidiaries and related entities (collectively, "Hunter Wise"), a purported precious metals dealer that recorded and tracked customer orders and trading positions.  In reality, Hunter Wise did not purchase, sell, finance and/or transfer metals in connection with Defendants' financed transactions, but rather traded derivatives in its own margin accounts.   Defendants knew or recklessly disregarded that Hunter Wise did not sell or transfer ownership of any physical metals and/or store physical metals in any depositories for or

on behalf of Lions Wealth and/or 20/20 Metals retail customers.  Defendants also did not disclose their relationship with Hunter Wise to retail customers.

7.      Although no physical metal is held anywhere in the Lions Wealth or 20/20 Metals customers' names, Lions Wealth and 20/20 Metals fraudulently charged Lions Wealth's and 20/20 Metals' customers commissions on orders for purchasing metals, interest on non-existent loans to finance supposed metals purchases, storage fees on non-existent metal, and other fees supposedly incurred in connection with the purchase of physical metals.  In the course of this scheme, during the relevant time, at least 44 Lions Wealth retail customers collectively incurred at least $1,807,712 in trading losses, commissions, interest charges and other fees, and at least 30 20/20 Metals retail customers collectively incurred at least $570,266 in trading losses, commissions, interest charges and other fees.

8.      By virtue of this conduct and the conduct further described herein, Defendants have engaged, are engaging, or are about to engage in conduct in violation of Sections 4(a), 4b(a)(2)(A)-(C), and 6(c)(1) of the Act, 7 U.S.C. §§ 6(a), 6b(a)(2)(A)-(C), 9(1) (2012), and Commission Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2013).

9.      Unless restrained and enjoined by this Court, Defendants are likely to continue engaging in the acts and practices alleged in this complaint or in similar acts and practices.

10.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Defendants' unlawful practices and to compel their compliance with the Act and the Regulations promulgated thereunder.  In addition, the CFTC seeks restitution, disgorgement, civil monetary penalties, and such other equitable relief as this Court may deem appropriate.

### III.   PARTIES

11.     Plaintiff U.S. Commodity Futures Trading Commission is an independent federal regulatory agency charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq.*, and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2013).

12.     From at least July 16, 2011 through July 31, 2012, Defendant Lions Wealth Holdings, Inc. was an active Nevada corporation with its principal place of business in in San Juan Capistrano, California.  From at least July 16, 2011 through the present, Defendant Lions Wealth Services, Inc. has been an active Nevada corporation with its principal place of business in San Juan Capistrano, California.   Neither LWH nor LWS has been registered with the Commission in any capacity.

13.     From at least November 2009 through December 2012, when its incorporation was revoked, Defendant 20/20 Precious Metals, Inc. was a Nevada corporation.  From at least July 16, 2011 through February 22, 2013, 20/20 Metals maintained an office in San Juan Capistrano, California.   20/20 Metals has never been registered with the Commission in any capacity.

14.     Defendant Bharat Adatia, also known as Brad Adatia, resides in San Juan Capistrano, California.  Adatia is the sole officer and director of LWH and 20/20 Metals, and the president and director of LWS.   Adatia managed and ran the day-to-day operations of Lions Wealth and 20/20 Metals, including communicating with Hunter Wise about retail metals transactions.   Adatia was registered with the Commission in various capacities from 1996 through 2009, including as an associated person of 20/20 Trading Company, Inc. ("20/20 Trading"), a registered introducing broker ("IB"), from 2000 to 2009.

## IV.    RELATED ENTITIES AND INJUNCTIVE ACTION

15.    Hunter Wise Commodities, LLC was formed as a California company in July 2007 and has been registered as a Nevada company since October 2010.  It maintains business addresses in Las Vegas, Nevada and Irvine, California.  Hunter Wise Commodities, LLC and its wholly owned subsidiaries and related entities include Hunter Wise Credit, LLC (a Nevada registered LLC), Hunter Wise Trading, LLC (a Nevada registered LLC) and Hunter Wise Services, LLC (a California registered LLC) (collectively "Hunter Wise").  Neither Hunter Wise Commodities LLC nor any of its subsidiaries or related entities has ever been registered with the Commission in any capacity.

16.    On December 5, 2012, the Commission filed a civil injunctive enforcement action in the U.S. District Court for the Southern District of Florida against Hunter Wise and various other entities and individuals, including certain metals firms that operated in similar manner to Lions Wealth and 20/20 Metals.  *See CFTC v. Hunter Wise Commodities, LLC, et al.,* Case No. 9:12-cv-81311-DMM (SD Fla.).  In that complaint, the Commission charged the defendants with fraudulently soliciting and accepting at least $46 million from hundreds of customers since July 2011 to invest in physical precious metals, such as gold, silver, platinum, palladium, and copper, and charging interest on loans, storage and insurance fees, when, in fact, the defendants did not own, purchase or store any metal for their customers.  On February 25, 2013, following an evidentiary hearing, the Court entered a Preliminary Injunction Order that, among other things, prohibits Hunter Wise from offering investments in physical metals to the retail public, and from transferring any funds, assets or property.  *See Order on Plaintiff's Motion for Preliminary Injunction,* Doc. No. 78, Case No. 9:12-cv-81311-DMM (SD Fla. Feb. 25, 2013).  The Court also appointed a special corporate monitor to oversee Hunter Wise's operations.

17.     In addition to 20/20 Metals and Lions Wealth, prior to the relevant time Adatia managed and ran the day-to-day operations of 20/20 Trading, a Nevada corporation that had its principal place of business in Laguna Niguel, California.  20/20 Trading first registered with the Commission as IB in 1999.  20/20 Trading ceased doing business in or about October 2009, prior to the effective date of the Dodd-Frank Act, and is therefore not a party to this action.

## V.     STATUTORY BACKGROUND

18.     Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D) (2012), applies to "any agreement, contract, or transaction in any commodity" that is entered into with, or offered to, a non-eligible contract participant ("ECP") "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis," with respect to conduct occurring on or after July 16, 2011, subject to certain exceptions not applicable here.  Such retail commodity transactions are subject to Sections 4(a), 4(b), and 4b of the Act, 7 U.S.C. §§ 6(a), 6(b), 6b (2012), "as if" they are a contract of sale of a commodity for future delivery.  7 U.S.C. § 2(c)(2)(D)(iii).

19.     An ECP is defined in relevant part as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.  Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi) (2012).

## VI.     FACTS

### A.  Overview of Defendants' Business Model

20.     During the relevant period, Defendants offered retail customers two types of off-exchange transactions: (1) the purchase or sale of physical metals such as coins and bars after full payment for actual delivery, and (2) trading of gold, silver, platinum, and palladium on a

leveraged, margined or financed basis ("Retail Commodity Transactions") in which retail customers purportedly purchased physical commodities and initially paid only a portion of the purchase price. Retail Commodity Transactions constituted the vast majority of Defendants' business, and it is only the Retail Commodity Transactions that are at issue in this Complaint.

21.      Upon information and belief, 20/20 Metals ceased soliciting new customers on or before July 16, 2011, the effective date of the Dodd-Frank Act. However, during the relevant time, 20/20 Metals' officers, agents, and other persons acting on its behalf continued to manage the trading accounts of, and offer Retail Commodity Transactions to, existing 20/20 Metals customers, while soliciting new customers to open accounts with Lions Wealth.

22.      Upon information and belief, few, if any of the Lions Wealth and/or 20/20 Metals retail customers were ECPs.

23.      The Retail Commodity Transactions between Lions Wealth and its customers, and the Retail Commodity Transactions between 20/20 Metals and its customers, were not conducted on or subject to the rules of any board of trade and did not involve the purchase of actual physical metals or physical metals traded on any market or exchange. Rather, the transactions involved speculating on the price movements of the physical metal as determined by Hunter Wise.

24.      Lions Wealth's marketing materials and website falsely represent that, through Retail Commodity Transactions, customers could purchase actual physical commodities, specifically gold, silver, platinum and palladium; that Lions Wealth provided financing for the purchase of physical metals; and that Lions Wealth would select a depository in which to store physical metals on the customers' behalf. Upon information and belief, the marketing materials provided to 20/20 Metals customers and prospective customers prior to the relevant time and the

ongoing oral representations during the relevant time made by Defendants to retail customers mirror those made in Lions Wealth's marketing materials and website.

25.     Defendants solicited customers to enter into Retail Commodity Transactions. Once a customer agreed to place an order to purchase or sell metals, Defendants contacted Hunter Wise to execute the order for that customer and transferred funds received from retail customers to Hunter Wise.

26.     Neither Lions Wealth nor 20/20 Metals ever had possession of, or title to, any physical metals in connection with Retail Commodity Transactions.

27.     Hunter Wise did not actually buy, sell, loan, store, or transfer physical metals in connection with Retail Commodity Transactions.  Rather, Hunter Wise recorded and tracked Defendants' retail customer orders, and managed its exposure to the retail customer trading positions by trading derivatives in its own margin trading accounts.

28.     Hunter Wise maintained account and trading records for all Lions Wealth and 20/20 Metals retail customer transactions, and generated account statements and other documents for Defendants' customers.  Hunter Wise also maintained a back-office support system, known as the "portal", through which Defendants accessed reports reflecting the performance of retail customer accounts.

29.     Defendants failed to conduct a reasonable inquiry to determine whether or not Hunter Wise purchased, sold or stored physical commodities on behalf of Lions Wealth and/or 20/20 Metals customers.  Defendants were aware of at least two depositories that, according to Hunter Wise, held metals belonging to Lions Wealth customers, but did not communicate directly with these depositories or provide the depositories with any instructions regarding the storage or sale of metals purportedly held on behalf of their retail customers.

30.     Further, Defendants knew or should have known that Hunter Wise did not have any physical metals based on a report filed in a prior Commission action.  On April 26, 2011, prior to the effective date of the Dodd-Frank Act and the broadening of the CFTC's anti-fraud jurisdiction, the Commission filed a civil injunctive enforcement action in the U.S. District Court for the Central District of California against 20/20 Metals and Adatia, as well as 20/20 Trading, a defunct entity and non-party to this action, and various individual defendants.  *See CFTC v. 20/20 Trading Company, Inc. et al*., Case No. SACV 11-643-JST (FMOx) (CD Cal.) (the "Prior 20/20 Litigation").

31.     In the Prior 20/20 Litigation, the Commission charged the defendants with committing fraud in connection with both commodity options trading and leveraged metals sales.  As to the purported sale of precious metals to retail customers, the business model employed by 20/20 Metals and 20/20 Trading prior to April 26, 2011 and at issue in the Prior 20/20 Litigation was the same or substantially similar to the business model utilized for the Retail Commodity Transactions as more fully described herein.  Ultimately, the court found that – prior to the amendments to the Act set forth in paragraphs 3 and 4, above – the Commission lacked jurisdiction over the defendants' leverage metals business and dismissed those claims.

32.     During the course of the Prior 20/20 Litigation, the court appointed a temporary receiver who filed a report on May 23, 2011.  *See CFTC v. 20/20 Trading, Rept. of Temporary Receiver's Activities*, Doc. No. 60. (CD Cal. May 23, 2011).  Among other things, the receiver advised the court and the parties in the Prior 20/20 Litigation that, after reviewing documents and conducting interviews with Adatia and representatives from Hunter Wise, among others, he was unable to "verify the existence, ownership, and safekeeping of precious metals" purportedly purchased and held in 20/20 Trading and 20/20 Metals customer accounts.

33.    Adatia received and reviewed the receiver's report, and therefore knew or recklessly disregarded that the court appointed receiver had been unable to identify, locate, and/or inspect any metal purportedly held on behalf of retail customers.  Nevertheless, Adatia subsequently failed to verify that any depository held or was holding metal on behalf of 20/20 Trading, 20/20 Metals, Lions Wealth and/or any of their customers during the relevant period of this action.

34.    Lions Wealth and 20/20 Metals customers were charged a commission (up to 15% of the total metal value of a single transactions and up to 38% of the funds deposited for each transaction), a price spread (a 1.5-3% mark-up or mark-down from the current price of the metal), interest on the purported loan (at an annual rate of approximately 9.5%) and other fees (such as a "service fee" of approximately 7% annually on the total market value of the account) for the Retail Commodity Transactions.  The customer's equity increased or decreased as prices of metals fluctuated, and was also subject to depletion on a daily basis by interest and service fees.  When a customer's equity fell below 15% of the value of the total trading position, the customer received a margin call, requiring the customer to deposit additional funds in order to maintain the trading position.  If the customer's equity dropped to 9% of the total value, any open trading positions were liquidated.

35.    Based on reports generated by Hunter Wise, during the relevant time, 44 Lions Wealth customers collectively deposited $2,241,787 into their accounts.  During that same time, Lions Wealth customers were charged $1,121,981 in commissions, $47,162 in interest charges, $44,149 in service fees and $812 in miscellaneous fees, and collectively incurred net trading losses of approximately $593,608.  Consequently, Lions Wealth customers collectively incurred

$1,807,712 in trading losses, commissions, interest charges and other fees during the relevant time.

36.     Based on reports generated by Hunter Wise, over the lifetime of 20/20 Metals operations, 20/20 Metals customers collectively deposited $1,864,549 into their accounts, $1,632,129 of which was deposited prior to the start of the relevant time.  As of July 16, 2011, 20/20 Metals had 30 active customer accounts.  During the relevant time, those customers deposited an additional $232,420 into their existing accounts.  Also during the relevant time, the active customer accounts were collectively charged $154,940 in commissions, $56,551 in interest and $53,657 in service fees, and collectively incurred net trading losses of approximately $305,078.  Consequently, 20/20 Metals customers collectively incurred $570,226 in trading losses, commissions, interest charges and other fees during the relevant time.

37.     Defendants received commissions based on the dollar value of the transactions entered for retail customers.  Hunter Wise also compensated Defendants with a portion of the price spread, interest, and service fees charged to customers for Retail Commodity Transactions.  Based on reports generated by Hunter Wise, during the relevant time Lions Wealth received $1,306,234 in commissions and fees and 20/20 Metals received $230,011 in commissions and fees.

### B.  Defendants Solicited Customers for Illegal, Off-Exchange Retail Commodity Transactions and Falsely Represented that Customers Were Purchasing Actual Physical Metal

38.     Lions Wealth contacted customers and prospective customers by telephone, email, and/or through its website.  20/20 Metals contacted customers by telephone and/or email and, prior to the relevant time, through its website.

39.     In connection with the Retail Commodity Transactions, Lions Wealth's website falsely represented that: (a) Lions Wealth's retail customers could purchase physical

commodities, specifically gold, silver, platinum and palladium; (b) customers purchased the "actual physical commodity in the "form of either bullion bars or coins", as opposed to buy[ing] a futures or options contract on an underlying commodity"; and (c) customers could elect to receive physical metals or have Lions Wealth store metals on the customer's behalf in "a depository selected by LWC" as Lions Wealth is "tied to and work[s] with experts who understand the specifics of storing metal bullion."

40.     In addition, Lions Wealth's written marketing materials falsely represented that in Retail Commodity Transactions customers purchased physical metals through a financing arrangement that had "the benefits of a 'down payment' similar to those found in real estate, where you buy a property" but "unlike real estate, the non-recourse loan . . . has limited risk similar to an 'option', but with no immediate expiration date to worry about.  With no ticking clock, [customers] have an open-ended commodity transaction."

41.     20/20 Metals' website, which is no longer active, claimed that retail customers could either take delivery of physical metals or rely on 20/20 Metals and its "experts who understand the specifics of storing metal bullion" for storage services—"We know how to keep your bullion safe and sound."   The website also mentioned the possibility of a customer financing a metals purchase.   Upon information and belief, 20/20 Metals customers continued to rely on the aforementioned representations during the relevant time.

42.     Through their officers, agents and other persons acting on their behalf, including Adatia, both Lions Wealth and 20/20 Metals knew or recklessly disregarded that, in connection with their Retail Commodity Transactions, neither they nor Hunter Wise purchased or sold physical metals, stored metals, delivered metals to an affiliate, bank or depository, or lent funds to customers for the purchase of physical metals.   Defendants also knew or recklessly

disregarded the fact that there were no accounts with any metals depository holding physical

metals in the name of Lions Wealth, 20/20 Metals and/or any of their retail customers.

> **C. When Purporting to Enter Into Retail Commodity Transactions,**
> **Defendants Made Material Misrepresentations to Retail Customers about**
> **the Purchase, Sale, Financing and Delivery of Physical Metals in the**
> **Account Agreements**

43.     Most, if not all, Lions Wealth customers executed the Customer Purchase and

Sale Agreement (the "Purchase Agreement") in which Lions Wealth falsely represented that

customers were purchasing "physical commodities" from Lions Wealth Capital "on credit with

financing provided by Lions Wealth Service[s] Inc., a Nevada Corporation."

44.     In the Purchase Agreement, Lions Wealth knowingly or recklessly misrepresented

that, within seven days of receiving a customer's payment of the required portion of the purchase

price, LWC would "deliver the commodities to Customer, to Customer's designee, or for the

benefit of Customer to banks or depositories used for the purpose of safekeeping Customer

commodities (collectively referred to as Bank)."    Further, Lions Wealth represented that

"Ownership of Commodities purchased by Customer, subject to any security interest therein,

passes to Customer upon delivery to Customer, Customer's appointed designee, or to Bank to be

held for Customer," and that "Commodities transferred to Bank for Customer will be delivered

as an undivided share of a fungible lot and held in safekeeping on a fungible basis with the

commodities of other Bank Customers."    The Purchase Agreement also states that "Upon

delivery of commodities for customer to Bank, Customer owns an undivided share of the

commodities so held."   Finally, in the Purchase Agreement, Lions Wealth represented that LWC

"may utilize one or more sources, including its own inventory, to acquire the physical

commodities necessary to fulfill its obligations to Customer."

45.     Upon information and belief, prior to July 16, 2011 most if not all 20/20 Metals customers executed a Purchase Agreement containing the same or substantially similar misrepresentations set forth in paragraphs 43 and 44, above.

46.     Most, if not all, Lions Wealth customers executed a Loan, Security and Storage Agreement (the "Loan Agreement") with Lions Wealth in which Lions Wealth falsely represented that LWS loans "physical commodities" or "sums of money to purchase physical commodities, including, but not limited to, delivery to a depository, costs, fees, storage, collateral, security interests, certain risks and costs associated with each loan transaction" to retail customers in exchange for a "security interest" in all "commodities" belonging to and held on behalf of the customer.

47.     The Loan Agreement states that "[c]ommodities transferred to Bank [defined as any bailee used by LWS] for Borrower will be delivered as an undivided share of a fungible lot and held in safekeeping on a fungible basis with the commodities of other Bank customers."  The Loan Agreement further specifies that "[u]pon delivery of commodities on behalf of Borrower to Bank, Borrower will receive a confirmation evidencing that such quantity of commodities has been delivered to the depository and is being and will continue to be held as an undivided share of the commodities so held by the depository, on the purchaser's behalf, free and clear of all liens and encumbrances, other than liens of [LWS]."

48.     Upon information and belief, prior to July 16, 2011, most if not all 20/20 Metals customers executed a Loan Agreement with 20/20 Metals containing the same or substantially similar misrepresentations set forth in paragraphs 46 and 47, above.

49.     Defendants did not disburse any funds for the so-called "loan" or "financed" portion of Retail Commodity Transactions, nor did Defendants ever intend to loan or finance the

Retail Commodity Transactions. Moreover, to the extent that Hunter Wise purported to extend purchase money loans to Defendant's customers, such loans were a sham because Hunter Wise never obtained any physical metal for, or delivered any such metal to, those customers.

50.     Based on a report generated by Hunter Wise, during the relevant time, Lions Wealth customers collectively paid $47,161 in interest on the purported loans to retail customers and 20/20 Metals customers collectively paid $56,551 in interest on the purported loans to retail customers in connection with Retail Commodity Transactions.

51.     Lions Wealth and 20/20 Metals made the material misrepresentations described above in paragraphs 43 to 49, above, knowing or in recklessly disregard of their falsity.

### D.  Defendants Caused False or Misleading Statements to Be Issued to Customers Regarding the Purchase, Sale, Financing and Delivery of Physical Metals in Customer Account Statements and "Transfer of Commodity" Notices

52.     Lions Wealth and 20/20 Metals caused account statements (the "customer account statements") and trade confirmations or "Transfer of Commodity" notices to be issued to their customers.

53.     Lions Wealth and 20/20 Metals customer account statements reflect metal purchases and sales that were not actually made.  Hunter Wise generated the customer account statements and transmitted them to Lions Wealth and/or 20/20 Metals, or directly to retail customers, pursuant to certain agreements between Hunter Wise and Defendants.  The customer account statements notified retail customers of "commodities purchased", "opening buy", "closing buy" and/or "commodity received" into the account.

54.     Further, the customer account statements informed customers that they had "loan fees" and a loan "balance" even though Defendants did not disburse any funds for the so-called

"loan" or "financed" portion of Retail Commodity Transactions and loans purportedly extended by Hunter Wise were a sham.

55.    Defendants also falsely claimed to "ship" or "receive" metals following each trade in Transfer of Commodity notices.   The Transfer of Commodity notices sent to retail customers included the following representations that mislead customers into believing that precious metals are being held in their name and for their account:

   a.  Product Received into your Account;

   b.  Product Shipped out of your Account;

   c.  Receipt of Goods.  You are hereby notified of delivery of commodities to the Custodian for your benefit;

   d.  Lions Wealth Services Inc. (LWC) hereby confirms that a depository ("Custodian") authorized by agreements referred to below has received custody of the goods therefore ("commodities") identified above;

   e.  The Custodian will hold such commodities in accordance with the terms and conditions of Lions Wealth Services Purchase and Sale Agreement and the Lions Wealth Holdings Loan and Security Agreement;

   f.  LWC records relating to the custody of such commodities are available for inspection at LWC during regular business hours;

   g.  The goods held by the Custodian represent LWC customer commodities stored by facilities authorized in the Loan and Security Agreement.  All such goods are subject to the specific terms and conditions of storage set forth therein;

   h.   The customer acknowledges that upon receipt of commodities for customer's account, Custodian will maintain collectively with the commodities held on behalf of all LWC customers' physical inventories which are held at one or more of several depositories. The Custodian reserves the right at its own expense to move the commodity from one storage facility to another. The Custodian also may at its own direction order LWC to transfer custody of your commodities to another Custodian provided such Custodian is authorized by the aforementioned Agreements and LWC is notified of such transfer; and

   i.  Delivery of Commodities: You are hereby notified that the Custodian has released the commodities identified above which it has held for you to LWC pursuant to your order for delivery or transfer of these commodities.

56. Upon information and belief, the Transfer of Commodity notices sent to 20/20 Metals customers contain the same or substantially similar representations set forth in paragraph 55, above, except that all references to LWC instead reference 20/20 Metals.

57. Each of these statements included in Transfer of Commodity notices is false or materially misleading. No physical metal was purchased, shipped, stored or delivered by any of the Defendants in connection with Retail Commodity Transactions. Retail customers do not and did not own or hold title to any physical metal.

58. Hunter Wise generated the customer account statements and Transfer of Commodity notices on the letterhead of Lions Wealth or 20/20 Metals, rather than on its own letterhead. There is no indication on these documents that they were generated and in many cases sent directly to retail customers by Hunter Wise. Defendants did not otherwise identify or disclose their relationship with Hunter Wise to retail customers.

59. Lions Wealth and 20/20 Metals issued the false or misleading statements described above in paragraphs 53 to 56, above, knowing or in recklessly disregard of their false or misleading nature.

### VII.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION'S REGULATIONS

**Count I**
**Violations of Section 4(a) of the Act:**
**Illegal Off-Exchange Transactions**

60. Paragraphs 1 through 59 are re-alleged and incorporated herein.

61. The Retail Commodity Transactions described in this Complaint were offered, entered into, and/or confirmed (a) on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis,

and (b) with persons who are not eligible contract participants or eligible commercial entities as defined by the Commodity Exchange Act.

62.     The commodities that were the subjects of the Retail Commodity Transactions are commodities as defined by Section 1a(4) of the Act, 7 U.S.C. § 1a(4).

63.     Section 4(a) of the Act, 7 U.S.C. § 6(a), in relevant part, makes it unlawful for any person to offer to enter into, execute, confirm the execution of, or conduct any office or business anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery unless the transaction is conducted on or subject to the rules of a board of trade that has been designated or registered by the Commission as a contract market.

64.     The Retail Commodity Transactions were not made or conducted on, or subject to, the rules of any board of trade, exchange or contract market.

65.     As set forth above, from at least July 16, 2011 through February 22, 2013, Lions Wealth and 20/20 Metals, individually and/or through their employees and agents including Adatia, violated Section 4(a) of the Act by offering to enter into, entering into, executing, confirming the execution of, or conducting an office or business in the United States for the purpose of soliciting or accepting orders for, or otherwise dealing in, transactions in, or in connection with, Retail Commodity Transactions.

66.     Each offer to enter into, entrance into, execution, confirmation, solicitation or acceptance of an order for a Retail Commodity Transaction made during the relevant time period is alleged as a separate and distinct violation of Section 4(a) of the Act.

67.     The acts, omissions and failures of the officials, agents, or persons acting for Lions Wealth and 20/20 Metals described in this Complaint occurred within the scope of their

employment, agency, or office with these entity defendants, and are deemed to be the acts, omissions and failures of those defendants by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

68.    During all relevant times, Adatia directly or indirectly controlled Lions Wealth and 20/20 Metals, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations of Lions Wealth and 20/20 Metals described in this Count One. Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Adatia is therefore liable as a controlling person for the violations by Lions Wealth and 20/20 Metals described in this Count One to the same extent as those defendants.

**Count II**
**Violations of Section 4b(a)(2)(A), (C) of the Act:**
**Fraud by Misrepresentations**

69.    Paragraphs 1 through 59 of this Complaint are realleged and incorporated herein by reference.

70.    Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C), in relevant part, makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for, on behalf of, or with any other person, other than on or subject to the rules of a designated contract market:  (A) to cheat or defraud or attempt to cheat or defraud the other person; or (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contact for, on behalf of, or with the other person.

71.    As set forth above, Lions Wealth and 20/20 Metals, individually and through their agents and employees including Adatia, cheated or defrauded, or attempted to cheat or defraud, their retail customers in or in connection with Retail Commodity Transactions by knowingly or

recklessly making false representations of material fact, or omitting material facts, to customers and, as to Lions Wealth, prospective customers.  Among other things, Lions Wealth and 20/20 Metals misrepresented that they:

    a.  purchased and sold actual physical metals to customers in Retail Commodity Transactions;

    b.  made loans to customers to purchase the physical metals;

    c.  transferred title of physical metals to customers; and

    d.  arranged for the transfer and storage of customers' physical metals in independent depositories where such metal was held on the customers' behalf.

72.    Lions Wealth and 20/20 Metals made these representations knowingly or with a reckless disregard for their truth or falsity.

73.    By this conduct, Lions Wealth and 20/20 Metals, by and through Adatia and other agents or persons acting on their behalf, violated Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C).

74.    Each material misrepresentation made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C).

75.    The acts, omissions and failures of Adatia and other employees, agents or persons acting for Lions Wealth and 20/20 Metals described in this Complaint occurred within the scope of their employment, agency, or office with Lions Wealth and 20/20 Metals and are deemed to be the acts, omissions and failures of those defendants by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

76.    During all relevant times, Adatia directly or indirectly controlled Lions Wealth and 20/20 Metals, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations of Lions Wealth and 20/20 Metals described in this Count Two.

Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Adatia is therefore liable as a controlling person for the violations by Lions Wealth and 20/20 Metals described in this Count Two to the same extent as those defendants.

**Count III**
**Violations of Section 4b(a)(2)(B) of the Act:**
**Fraud by False Statements**

77.     Paragraphs 1 through 59 of this Complaint are realleged and incorporated herein by reference.

78.     Section 4b(a)(2)(B) of the Act, 7 U.S.C. § 6b(a)(2)(B), in relevant part, makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for, on behalf of, or with any other person, other than on or subject to the rules of a designated contract market . . . (B) willfully to make or cause to be made to the other person any false report or statement, or willfully to enter or cause to be entered for the other person any false record.

79.     As set forth above, from at least July 16, 2011 through February 22, 2013, Lions Wealth and 20/20 Metals, through their agents and employees including Adatia, knowingly or recklessly caused false written monthly account statements to be made to customers in connection with Retail Commodity Transactions.  Among other things, Defendants falsely claimed to buy and receive physical metals, and to charge customers interest and loan fees on an accumulated loan balance.

80.     Lions Wealth and 20/20 Metals, by and through Adatia and other agents or persons acting on their behalf, engaged in the acts and practices described above knowingly or with reckless disregard for their truth or falsity.

22

81.     By this conduct, Lions Wealth and 20/20 Metals, by and through Adatia and other agents or persons acting on their behalf, violated Section 4b(a)(2)(B) of the Act, 7 U.S.C. § 6b(a)(2)(B).

82.     Each false written statement to a retail customer made during the relevant period, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Sections 4b(a)(2)(B) of the Act.

83.     The acts, omissions and failures of Adatia and other employees, agents or persons acting for Lions Wealth and 20/20 Metals described in this Complaint occurred within the scope of their employment, agency, or office with Lions Wealth and/or 20/20 Metals and are deemed to be the acts, omissions and failures of those defendants by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

84.     During all relevant times, Adatia directly or indirectly controlled Lions Wealth and 20/20 Metals, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violations of Lions Wealth and 20/20 Metals described in this Count Three. Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Adatia is therefore liable as a controlling person for the violations by Lions Wealth and 20/20 Metals described in this Count Three to the same extent as those defendants.

**Count IV**
**Violations of Section 6(c)(1) of the Act and Regulation 180.1(a)(1)-(3)**
**Use of a Deceptive Scheme and Artifice to Defraud**

85.     Paragraphs 1 through 59 of this Complaint are realleged and incorporated herein by reference.

86.     Section 6(c)(1) of the Act, 7 U.S.C. §9(1) (2012), in relevant part, makes it unlawful for any person to use or employ, or attempt to use or employ, in connection with any contract of sale of any commodity in interstate commerce or for future delivery, any

manipulative or deceptive device or contrivance in contravention of the Commission's Rules and Regulations.

87.     Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2013), in relevant part, makes it unlawful for any person, in or in connection with any contract of sale of any commodity for future delivery, to: (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make or attempt to make any untrue or misleading statement of a material fact; or (3) engage, or attempt to engage, in any act, practice or course of business, which operates or would operate as a fraud or deceit; in connection with acts occurring on or after August 15, 2011.

88.     Beginning on August 15, 2011 and continuing at least through February 22, 2013, Lions Wealth and 20/20 Metals, by and through Adatia and other agents or persons acting on their behalf, in connection with contracts of sale of commodities in interstate commerce, knowingly or recklessly used or employed a manipulative device,, scheme and/or artifice to defraud in violation of Commission Regulation 180.1(a)(1).   During that same time, Lions Wealth and 20/20 Metals, by and through Adatia and other agents or persons acting on their behalf, knowingly or recklessly made untrue or misleading statements of material fact to retail customers in violation of Commission Regulation 180.1(a)(2); and engaged in acts practices or a course of business which operated as a fraud upon their retail customers in violation of Commission Regulation 180.1(a)(3).

89.     As set forth above, Lions Wealth and 20/20 Metals, by and through Adatia and other agents or persons acting on their behalf, violated Section 6(c)(1) of the Act and Regulation 180.1(a)(1)-(3) by knowingly or recklessly: (1) making the material misrepresentations on their websites written marketing materials as set forth in paragraphs 41 to 43, and in the customer

Purchase Agreements and Loan Agreements as set forth in paragraphs 46 to 51, and (2) issuing

false statement to customers as set forth in paragraphs 55 to 58.

90.     Each material misrepresentation and false statement made between August 15,

2011 and the present, including but not limited to those specifically alleged herein, is alleged as a

separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(1)-(3).

91.     The acts, omissions and failures of Adatia and other employees, agents or persons

acting for Lions Wealth and 20/20 Metals described in this Complaint occurred within the scope

of their employment, agency, or office with Lions Wealth and/or 20/20 Metals, and are deemed

to be the acts, omissions and failures of those defendants by operation of Section 2(a)(1)(B) of

the Act, 7 U.S.C. § 2(a)(1)(B)  (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2013).

92.     During all relevant times, Adatia directly or indirectly controlled Lions Wealth

and 20/20 Metals, and did not act in good faith or knowingly induced, directly or indirectly, the

acts constituting the violations of Lions Wealth described in this Count Four.  Pursuant to

Section 13(b) of the Act, 7 U.S.C. § 13c(b), Adatia is therefore liable as a controlling person for

the violations by Lions Wealth and 20/20 Metals described in this Count Four to the same extent

as those defendants.

## VIII.   RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by

Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

**A.**     An order finding that Defendants violated Sections 4(a), 4b(a)(2)(A)-(C), and

6(c)(1) of the Act, 7 U.S.C. §§ 6(a), 6b(a)(2)(A)-(C), and 9(1) (2012), and Commission

Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2013);

B.      An order of permanent injunction prohibiting Defendants, and any other person or entity associated with them, from engaging in conduct in violation of Sections 4(a), 4b and 6(c)(1) of the Act and Regulation 180.1(a);

C.      An order of permanent injunction permanently restraining, enjoining and prohibiting Defendants from, directly or indirectly:

(1)      Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a);

(2)      Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3(hh)), 17 C.F.R. § 1.3(hh) (2013)) ("commodity options"), security futures products, swaps (as that term is defined in Section 1a(47) of the Act and as further defined by Commission Regulation 1.3(xxx), 17 C.F.R. § 1.3(xxx) (2013)), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts"), for their own personal accounts or for any accounts in which they have a direct or indirect interest;

(3)      Having any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts traded on their behalf;

(4)      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts;

(5)     Soliciting, receiving or accepting any funds from any person for the

purpose of purchasing or selling any commodity futures, options on commodity

futures, commodity options, security futures products, swaps, and/or forex

contracts;

(6)     Applying for registration or claiming exemption from registration with the

Commission in any capacity, and engaging in any activity requiring such

registration or exemption from registration with the Commission, except as

provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2013); and

(7)     Acting as a principal (as that term is defined in Regulation 3.1(a),

17 C.F.R. § 3.1(a) (2013)), agent, or any other officer or employee of any person

registered, exempted from registration or required to be registered with the

Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R.

§ 4.14(a)(9) (2013).

D.     Enter an order requiring that Defendants, as well as any of their successors,

disgorge to any officer appointed or directed by the Court all benefits received including,

but not limited to, salaries, commissions, loans, fees, revenues and trading profits

derived, directly or indirectly, from acts or practices that constitute violations of the Act

and the Regulations, including pre and post-judgment interest;

E.     Enter an order requiring Defendants, as well as any of their successors, to make

full restitution, pursuant to such procedure as the Court may order, to every person or

entity whose funds were received or utilized by them in violation of the provisions of the

Act and/or Commission Regulations, as described herein, plus pre-judgment interest

thereon from the date of such violations, plus post-judgment interest;

F.      Enter an order directing Defendants and any of their successors, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between it and any of the customers whose funds were received by them as a result of the acts and practices, which constituted violations of the Act and the Regulations as described herein;

G.      Enter an order requiring Defendants to pay civil monetary penalties under the Act, to be assessed by the Court, in amounts of not more than the greater of: (1) triple their monetary gain for each violation of the Act and the Regulations, or (2) $140,000 for each violation committed on or after October 23, 2008;

H.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2012); and

I.      Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Date: September 30, 2013                    Respectfully submitted,

U.S. COMMODITY FUTURES TRADING COMMISSION

/s/ Elizabeth N. Pendleton
Senior Trial Attorney
Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0629
*ependleton@cftc.gov*

William P. Janulis
Chief Trial Attorney
Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0545
*wjanulis@cftc.gov*

Rosemary Hollinger
Associate Director
Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661
(312) 596-0520
*rhollinger@cftc.gov*